JOHN H. DiSTEFANO, *Adm'r vs.* GEORGE W. HUGHES *et al., Coex'rs, et al.*

JANUARY 12, 1951.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

CONDON, J. This is a bill in equity to declare null and void certain conveyances and transfers of real and personal estate made by complainant's decedent shortly before his decease. The bill also prays for auxiliary relief. The cause is here on respondents' appeal from a final decree of the superior court granting the relief prayed for.

Respondents contend that the trial justice erred in that he misconceived which party had called certain witnesses and for which party they testified; that he overlooked important evidence; and that he misconceived the medical testimony concerning the mental capacity of the decedent. We shall consider only those reasons of appeal since respondents have neither briefed nor argued their other reasons. *Cliff* v. *Pinto,* 74 R. I. 369.

The basic question raised by the appeal is whether the trial justice erred in finding that the decedent did not have the mental capacity to execute the instruments in question. Respondents argue that he was led into error because he did not correctly consider all the evidence. On the other hand complainant contends that the trial justice's finding

is a fair and reasonable deduction from the evidence and therefore should not be disturbed by this court.

That question can be determined only by consideration of all the evidence. It appears therefrom that on October 15, 1945 the decedent James M. Carroll, hereinafter sometimes referred to as James, executed by his mark a series of instruments by means of which he transferred virtually all of his estate to his brother Hugh V. Carroll. On that date James was ill in bed with chronic arthritis, diabetes and arteriosclerosis. He had been suffering from those diseases as far back as April 1945. By September his condition had become so much worse that he gave up participation in the grocery business in which he had been associated with his brother as a copartner for forty years. Thereafter he was confined to his home and, for several weeks prior to October 15, 1945, to his bed where he remained until his decease on December 24, 1945. At that time he was over seventy years of age, and according to the death certificate he died of arteriosclerosis and tumor of the brain.

He did not leave a will and it was thought that he left no estate. However, after his death checks payable to him for dividends on certain stocks were being received indicating that he had not disposed of all of his property by the instruments in question here. This finally led to the discovery of such stocks in a safe in James' room which made necessary the appointment of an administrator of his estate. There was considerable delay in filing a petition for this purpose, but at the insistence of the bank which had been honoring the dividend checks, although they were payable only to the order of James M. Carroll, Hugh V. Carroll, by his attorney, at length filed such a petition on March 22, 1948. Hugh was ill at that time and died shortly afterward on April 4, 1948. On such petition George W. Hughes, husband of James' sister Mary, was appointed administrator. However, upon objection to his appointment being raised shortly thereafter by some of the next

of kin, he resigned and in his stead complainant, a stranger, was appointed.

The nature and duration of James' illness and the effect it had on his general physical condition is in evidence and is important. At least as early as April 11, 1945 Dr. George B. Farrell found him to be suffering from diabetes mellitus, inguinal hernia, chronic arthritis and arteriosclerosis. On April 18, 1945 the doctor saw him again and found him no better. He testified that James at that time had a "bad case of diabetes mellitus"; his arteries were "hard," "indurated," "pipestem"; and he was unsteady on his feet and drowsy. The doctor further testified that if the patient stayed under treatment his condition might be held stationary but if not it would get progressively worse and his mental processes would deteriorate.

Thereafter James did not receive any steady system of treatment and he did get worse until finally he was confined to his bed. On September 25, 1945 Dr. John A. Mack attended and examined him. He called again on September 27, 1945 and reported the results of his examination to Mrs. George W. Hughes, sister of James. He told her that her brother had some kind of a brain injury and arteriosclerosis and that nothing could be done for him.

On October 4, 1945 Dr. George B. Farrell was called. He saw James in bed and tried to talk to him but could not rouse him; he would not open his eyes; he was much worse than he was in April when the doctor had last seen him; he was not "oriented" and was just "vegetating." Dr. Farrell was afraid the patient was going into a coma and said that nothing could be done for him outside of relieving his pain or distress. After Dr. Farrell's visit James received no further medical attention. There is no evidence in the record of any improvement in his condition thereafter. On the contrary it is fairly inferable from the evidence that it progressively worsened.

It was while in such a condition, propped up in his bed and assisted by others, that on October 15, 1945 he signed

by his mark some twenty documents purporting to divest himself of title to all his property and to vest it in his brother Hugh V. Carroll. One of those who took a chief part in obtaining the signature of James M. Carroll on each of those documents was Hugh V. Carroll's lawyer, who was later retained by Hugh to file belatedly the petition for the appointment of an administrator of James' estate. On the witness stand he admitted that he was not James' lawyer and had not been consulted by him prior to October 15, 1945. Indeed he testified it was Hugh V. Carroll who asked him to attend to the transactions of that date. Apparently he made no real effort to ascertain James' mental condition before obtaining his marks on the instruments in question.

Without going into detail concerning what happened in James' bedroom on the afternoon of October 15, 1945 the circumstances as they are recorded in the transcript are, in our opinion, highly suspicious. The fact that James of his own free will was supposed to be disposing of all of his estate before his death and yet did not include therein or say anything about the existence of other securities of substantial value which were then in a safe in the room where this transaction was taking place only adds to such suspicion. More than that it furnishes strong ground for an inference that James did not on that day know his property or the nature of what he was doing.

This ground for an inference is confirmed by an admission made by respondent George W. Hughes who was present on that occasion. When he was asked on the witness stand why he did not ask James on October 15, 1945 for the combination of the safe so that it might be opened he answered: "We did. He didn't remember it, or couldn't tell us, anyway." Such an inference is further strengthened by Dr. Farrell's opinion that on October 4, 1945 James did not know where he was, who was talking to him, or what time it was; in other words, that he was

not oriented and that there had been progressive deterioration in his condition.

Respondents presented no medical testimony to rebut the above inference. In fact the record is devoid of any substantial evidence tending to prove that James was mentally capable of transacting business on October 15, 1945. The testimony of those who were present at his bedside on that occasion was not convincing to the trial justice who saw and heard them testify. Moreover as we read the transcript, their testimony appears to be rather weak and questionable. If, as respondents argue, the trial justice's rescript seems to indicate that he may have misconceived or overlooked certain evidence it is of no consequence, because upon our independent appraisal therof we find that the evidence reasonably supports his decision.

The validity of the instruments in question can be established if at all only on the theory of a gift. There is no merit in respondents' contention that there was consideration for them. On the theory that they were a gift respondents had the burden of showing by satisfactory evidence that the donor James had the mental capacity to execute the several conveyances and transfers and that he acted of his own free will, since in the circumstances here the donee Hugh was shown to be in a position of trust and confidence in relation to his brother. *Kerr* v. *McKenna,* 57 R. I. 252; *Union Trust Co.* v. *Davies,* 53 R. I. 63. The respondents, in our opinion, clearly failed to discharge that burden. On the contrary the evidence strongly tends to prove the mental incapacity of James and an absence of free will on his part in the execution of the instruments in question.

The respondents' appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court.

*Voigt, Wright & Slade, Ernst T. Voigt, Edward J. Plunkett, Carroll & Dwyer, John G. Carroll, Lester T. Murphy,* for complainant.

*Quinn & Quinn, Patrick H. Quinn, Charles F. Cottam,* for respondents.